If it may please the Court, Jeremy Richards, appearing on behalf of Appellant SNTL Litigation Trust. Your Honours, I'd like to spend my time focusing on what we believe is the primary issue in this case, which is the issue of the extent to which the disgorgement by a creditor of a preferential transfer allows that creditor to sue on a guarantee that has been previously released. Your Honours, counsel, I was puzzled, I suppose you'd say, by the appellant's position. As I understand it, even outside of bankruptcy, if a settlement is made, we'll pay you $5,000 for the fender-bender damage to your car, you sign a release, everything's fine, the case is settled, and then the check bounces that the person who signed the release now has an election. The original claim is revived, so he can sue for the damage to his car. Also, he can sue for breach of contract for failure to pay the $5,000 that was agreed upon in the release. It looks to me as though that's codified for purposes of this case, and precisely or not codified by statute. I think it was codified in the agreement. And I don't see why there would be any problem with revival of the claim or a new claim based on failure to pay the money agreed upon in the settlement. Your Honour, if I may respond to your question by focusing on two things. Number one, the nature of the release that was actually bargained for. And number two, the nature of the remedy that is relied upon by appellee. Your Honour, the release that was actually bargained for was a release that was conditioned on six conditions, including the receipt, and I believe that's the exact words that are used in Article III of the relevant agreement, the receipt of the partial commutation payment of approximately $163 million. So as the Bankruptcy Court found, all of the preconditions to the effectiveness of the Article III release were satisfied, and the release became effective and binding. The situation, Your Honour, posits of a check that bounces is clearly a different situation because there the bargain for consideration was not received. I don't know if that's right. The bargain for consideration was received and then snatched away in this case. Your Honour, I would respectfully disagree for two reasons. Number one, the parties clearly contemplated that the payment could be snatched away. Let's look at the exact words here. What should I be looking at? Your Honour, the release is Article III, which is page 3 of the PCSA. I'm looking at page 1080 of the excerpts. Is that right? Your Honour, the problem is the PCSA appears in a number of different places. It's helpful to have excerpts, page numbers. Your Honour, I have an excerpt. It's tab 10, Your Honour. I'm sorry, tab 18, commencing at page 1235 of the record. That is one copy of the PCSA. And the relevant page. I don't have those pages in front of me, but aren't I looking at the right thing here? Your Honour, the document is entitled Partial Commutation and Settlement Agreement. Is that what I should be looking at? The document is entitled Partial Commutation and Settlement Agreement. Okay, I'm looking at the wrong thing. I apologize, Your Honour. I only made one notation. Okay, now I've got the Partial Commutation and Settlement Agreement. I've got it at page 705 of the excerpts. So if Your Honour will turn to page 3 of the document, which is Article III, entitled Partial Commutation Release. Got it. So, Your Honour, the condition that is set forth in Article III is, among other things, subject to, in the third word, receipt of the commutation payment. And there is no dispute, it's an uncontested finding of the Bankruptcy Court, that the payment was received. As we argue to the Bankruptcy Court, and as I believe the Bankruptcy Court recognized, I don't know if it was received. It was taken away. Wasn't the Bankruptcy Court decision vacated by the Bankruptcy Appellate Panel? Yes, it was, Your Honour, yes. Yes, we are arguing from a decision that went against us. But, Your Honour, the – had the appellee – And I remember there was another provision in here that spoke to what happens if they lose it because it's a preference. Correct, Your Honour. That is Article X of the document at page 8 of the agreement. But, Your Honour, if I may continue, the point is that Article III speaks of receipt of funds. It does not speak of the inalienable receipt of funds, which is a common term used among practitioners operating in the zone of insolvency. And it also did not provide that the release would become effective after the running of relevant preference periods, which in this case would have been 120 days, given that we were dealing with insurance companies. That is also a common technique used by insolvency lawyers to protect their clients against this situation. What happened here, Your Honour, is that they negotiated for a release that became effective immediately upon receipt of the funds, number one. Number two, Your Honour, as they admit in their brief and as Article X demonstrates, they contemplated, they clearly understood that that payment could be taken away from them. They knew the insurance companies that have made the transfer were at risk of going into some sort of insolvency or conservatorship. So they did, Your Honour, reserve an express remedy to deal with that situation. Why aren't they just exercising that Article X remedy? That's a very good question, Your Honour, and frankly, we were surprised that they didn't. And I think the answer is quite simple. Article X, which was the bargain for remedy in this situation, is a rescissionary remedy. If they exercise It's both. It's just like what I described in the fender bender. They can either enforce the agreement or they can declare it null and void and enforce the underlying obligations. Correct, Your Honour. But in terms of undoing the release, those are their only options. They can leave the agreement in effect, in which case the release is binding and such and such And the amount of money, that's what they're doing. They're just claiming the amount of money under their deal. But, Your Honour, that's not what they're doing, Your Honour. They're not invoking anything in Article X. They are invoking, which was the second part of the answer that I wanted to get to, Your Honour, they are invoking a common law remedy that Article X just happens to expressly reserve. So frankly, Article X is a red herring, Your Honour. The remedy they are invoking is a common law remedy, which frankly is not controversial. We don't dispute it. That if a creditor disgorges a preference payment back to a debtor or a trustee in a bankruptcy, the claim of the creditor against the guarantor is revived, provided, Your Honour, the guarantee is still valid and enforceable. And the key case they rely upon, the Wallace hardware case, acknowledges that itself, Your Honour, because what it's I feel like what you're saying is that revivals in these release cases where the money isn't paid are illusory because the underlying claim has been extinguished by the release that wasn't paid for. I'm not saying it's an illusory remedy, Your Honour, but what I am saying, and if the Court will look specifically at the Wallace hardware decision, and in particular at page 408 of that decision, what Wallace hardware said is we reach the result that the creditor can go against the guarantor to recover the disgorged payment and hear the exact words of the Court, Your Honour, assuming, of course, the guarantee is otherwise enforceable. And what we have in this situation, Your Honour, is a different factual scenario. We have a situation where the guarantee was expressly released, and the remedy that the appellee chooses to exercise Back up a second. Where is it on 408? I'm looking at 408. I believe it is the first paragraph that commences on page 408 that begins, Viewed in this context, it is clear that Wallace hardware, et cetera, and then a few lines down, the Court says, assuming, of course, the guarantee is otherwise enforceable. Now, Your Honour, we have cited to three cases, the Contractors Technology, Express Liquor, and Henry v. Franklin National Bank, which all talk about this particular doctrine, Your Honour, which is rooted in a case called Herman Cantor, which is acknowledged by the Sixth Circuit Court in the Wallace hardware decision. But in all of those cases, Contractors Technology, Express Liquor, and Henry v. Franklin National Bank, the underlying guarantee had either expressly or impliedly been released. And subsequently, the creditor was required to disgorge a preference payment to a trustee or some other bankruptcy representative, sued on the guarantee, and in each of those three cases, Your Honour, the courts recognized the Wallace hardware common law doctrine, but said it did not apply in those situations because the release had been expressly guaranteed, expressly released. And, Your Honour, that is precisely what has happened in this case. Article III was a binding, enforceable doctrine. But what you're saying is that even though the common law says that, well, you know, we don't even need to deal with the revival of the claim, come to think of it. All we need is the claim on the release because that's all the money they're claiming is, what they would get if the money for the release was paid. And you're saying that even though the common law would let them make that claim, and even though Article X lets them make that claim, they can't make that claim because it depends on the underlying claim still being alive, and it's dead because even though the release wasn't paid for, it still released it. Have I got the logic of your argument? I might state that a different way, Your Honour. Number one, they do not exercise the rescissionary remedy under Article X, which would have allowed them by its express terms, and that is what the parties bargained for. They do not exercise the express Article X remedy, so they're not seeking to – I don't understand what you mean, they do not exercise it. They have said, Your Honour, they are not relying upon any of the remedies that are expressly set forth in Article X, including an express remedy in the event that they have to disgorge the $163 million payment. They reserve to themselves an express remedy to elect to rescind the agreement, and then it says in parentheses, including, without limitation, I believe, the releases themselves. So they negotiated for an express provision that would have allowed them to undo the releases in the event they had to give money back to an insurance commissioner. They did not exercise that remedy, because to do so, they would have been required to give back to what was now an insolvent entity, substantial other consideration that they received under this settlement agreement. So instead of relying on that provision, they rely on something which they didn't even argue in front of the bankruptcy court. They rely on this common law doctrine that is stated in Wallace Hardware. And, Your Honour, our argument is we don't dispute that that common law doctrine exists. However, as indicated in the Wallace Hardware decision at page 408, it has its limitations. And the limitation is that when a creditor disgorges a preference payment back to an insolvency estate, it can recover that payment from a guarantor, provided the guarantee is still effective. And in this case, Your Honour, pursuant to Article 3, which the trial court found was enforceable and has remained enforceable at all relevant times, they can't do that. The flaw in your argument according to the BAP is that Article 10 supersedes Article 3. Your Honour, with all due respect, I think that's a flaw in the BAP's analysis, because Article 10 is irrelevant. Article 10 is really a red herring to our argument. They are not seeking to enforce any remedies out of Article 10. All they're doing is they're relying on a savings clause that says, in addition to the Article 10 remedies, we appellee preserve our rights under common law. And they found in their argument before the BAP this one particular common law doctrine, which they had not argued at the bankruptcy court level, which works but only to an extent. And as Wallace Hardware says, it doesn't work to get around enforcing a guarantee that has been released. All the Wallace Hardware case says is if a creditor makes a payment, rather, if a debtor makes a payment to a creditor, which is subsequently recovered, so the creditor has to give that money back to its debtor, provided the guarantee has not otherwise been released, the creditor can then go against the guarantor for that payment. And that is a very uncontroversial statement of law, albeit it comes from the Sixth Circuit. I think that is a very, very well-recognized common law doctrine. But as I say, Your Honour, it has its limitations, and the limitations are set forth right there in Wallace Hardware. And the three cases that we cite, Contractors Technology, Express Liquor, and the Henry v. Franklin Bank cases, are all factually on all fours with this case. Thank you, counsel. Thank you, Your Honours. Good morning, Your Honours. May it please the Court. My name is Robert Milner, and I'm here on behalf of the Center Insurance Company. I would ask, please, that you keep that partial commutation agreement before Your Honours, because it is a very important agreement. The case, in fact, is not a complicated case. The actual rule of law that we are seeking here is, as the BAP made clear, that the contract, that partial commutation agreement should be construed according to its terms and that every term should be given meaning. And one thing that Mr. Richard said repeatedly that's wrong is that we're not seeking to invoke a remedy under the Article 10. We are, and that's what I want to review with you. The agreement has two articles that are very important here, Your Honours. There's an Article 3, which is a release, and then there's an Article 10. And the Article 10 is a reservation of rights in the event that the payment to my client, the $163 million, was either found or ordered or judged to be a preference or subject to a preference claim. That triggering event happened, and that reservation of rights, therefore, became active. And what that reservation of rights says, if you read down the page, it begins, if you could turn to it, it's Article 10. It begins with this long recitation of in the event, and if you drop down 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 lines in the event, and then there's a reference to an order, judgment, or other finding that it's subject to a claim or preference, and this was found ordered to be subject to a preference claim because the State judge who approved the settlement of the preference claim against our client center approved a settlement agreement in full, and that settlement agreement said, quite literally, that this payment is being made on account of a preference claim. And the accuracy of testimony found that. After those words, and this is quite important, it says, then, sedent. Sedent is the center insurance company in this document. May, in its sole discretion, it has a choice. And then here are some very important words. Those words, in addition to any other remedy provided by law, equity, statute, or contract, and then it lists four additional items. Those words, in addition to any other remedy provided by law, equity, statute, or contract, preserve to us at our discretion, as it says, the ability in the event that this preferential finding is made, to undertake any other remedy at law, statute, contract, or equity. And then there are four additional remedies. It's not merely in those four additional remedies that are enumerated to enforce or nullify. There's a remedy C to declare other agreements void. There's a remedy D to offset. But what Mr. Richards wants to do and what his brief does continuously is take a red pen and strike out those words, in addition, at our discretion, to any other remedy provided by law, equity, statute, or contract. That is a carve-out. That is a reservation of rights that says we reserve those rights if such a finding is made, and that those rights come into being. You could so, literally, my opponent concedes that there's a remedy at law, the remedy of the revival of the right, of the right against. Roberts.  You're going to ask me on the detail of that. As I recall the common law, the creditor has an election either to sue on the revived claim or to sue for the amount of the release, treating it as a contract claim. And it looks to me from the amount of money as though what you're doing is the second suing on the amount and the release. Have I got that right? Suing? We're suing for the amount of money that we paid back, which is less than the amount in the release. We paid back. The common law remedy that we are invoking is a remedy that says the amount that you paid back is what you're suing for. As I understand it, the way you calculate your suit is the amount of the settlement minus what you've got to keep. And that's why I interpreted it the way I did. To go back to my really simple example of the fender bender, everybody's trying to keep it away from the insurance company, so the careless driver gives the person a check for $1,000 right now and gives them a check for $4,000 more the next day. The $1,000 check clears. The $4,000 check bounces. The guy with the damaged car can either sue for the amount of the damages, which might be disputed, or he can sue for the $5,000 minus the $1,000 that he got. And I think you're suing for the $5,000 minus the $1,000 you got. We are, but I don't Have I got that right? You do. But let me express it to be very clear. We got $163 million. We had to give back $110 million. So effectively we didn't get the $110 million. We have a claim for what we didn't get, the $110 million. In your example, it's the $4,000. That's what the insurance company didn't get. So I hope that clarifies it in a way that we understand each other. Yes, it does. It makes me think what you're suing for here is not the revived underlying claim, but the amount of the settlement less what you actually got to keep from the settlement. Yes, the $110 million that we had to give back is what we are. However you want to call it, it's the $110 million. That's what we effectively One is a revived claim. One is a new claim. Okay. We're calling that a revived claim, but I don't want to use, let that get us mixed up. We're suing for the $110 million which we had to give back. That's what we effectively didn't get. Under that same Wallace Hardware case, we have a right to seek recovery of the $110. To be very clear here, we cannot effectively get that money back from the insurance companies in state court because in a state insurance insolvency, the priority on a reinsurance claim is not the policyholder priority, but a lower priority. So there's nothing there. So what we're going after is the right on the guarantee we had, which is from Mr. Richards' client, which was a holding company, which is a debtor in bankruptcy, and there's a fractional payment being made there. So we're going to seek the money against the debtor. Oh, so it is on the guarantee. Now I understand. We are suing on the guarantee. That's the one target we have, quite frankly. So if we interpreted it the way I was putting it, we mess up your priorities. It may, but we're going against the guarantee. It's for the $110 million that we didn't get, and that is what we're doing. Anyway. Mr. Richards puts a lot of stock in Wallace Hardware being distinguished, distinguishable. Can you tell us why he's wrong on that? For one very simple and basic reason. His distinction of Wallace Hardware, I think, to the extent he gives one, is that Wallace Hardware doesn't make mention of a release. He says here he had a release in Article III. The reason the distinction doesn't hold is that the same agreement that presents you with the Article III has a Has Article X. Has Article X, a reservation of rights if something happens. So this is a release that has a carve-out in it if this preference event happened. So our rights exist, are reserved. So if you have a release, and the release has another provision that says this isn't a release if such and such happens, that's where that gets us. The release is Article III. The reservation of rights is Article X. And that's why the Bankruptcy Appellate Panel says that Article X supersedes Article III. It really doesn't supersede. They are to be construed, as I read, together. In fact, as a California – California is – I'm not a local lawyer here, but California has statutes apparently for everything. And California has a statute, Civil Code 1641, which says the whole of a contract is to be taken together so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. And so what I take that to mean is that my opponent cannot take a red pen and excise out those words in addition, at my client's discretion, of other remedies at law – law, contract, statute, equity. He can't cross those out. And he can't eliminate Article X from the entire agreement. Can I change the subject for a second? Yes. You're also trying to get your post-petition attorney's fee. I am. What's the story on that? The story is as follows. There's a divide in authority on that. The Travelers case came down from the Supreme Court. It invalidated the rule of this Court in a case called Fobian, which enunciated a rule, basically, that if the fees were incurred under a pre-petition contract, but the work was done post-petition, on bankruptcy-related issues you couldn't get the fees, but under state law issues you could. And the Supreme Court said there's really no authority for that. It did not decide the issue. That's before us. Fortunately, though, the Supreme Court laid out what I would call a method of interpretation. And what the Supreme Court of the United States said in that same Travelers case is basically as follows. In general, claims that are enforceable under state law will be enforceable in bankruptcy. And they pointed to Section 502B of the Bankruptcy Code and said that section lists exceptions to this. For example, if it's for unmatured interest, et cetera, et cetera, et cetera. And you have to look to see whether you come, the claim comes within one of those exceptions. And what the Bankruptcy Appellate Panel here said is that this claim does not come within one of those exceptions. Now, do I understand correctly that the Sixth Circuit recently dealt with this in Dow? Or am I confusing it? If it has, I don't know of it. I thought there was a new case from Millsphere. We can check. We looked at the SNTL decision from the Bankruptcy Appellate Panel here, Your Honor. And we found that there were three cases citing it. Dow Corning. Dow Corning and the Sixth Circuit. Does that ring a bell? What's the name of the case? Dow Corning. We'll look at it. But I will – I don't – I didn't see it. I thought the logic of your argument on the attorney's fees was Traveler says we presume that claims enforceable under State law will be allowed in bankruptcy unless they're expressly disallowed. Exactly. The postpetition fees are disallowed for secured claims under 506, but not for unsecured claims in 502, and therefore this general presumption applies. Close. Is that – okay. Correct me. Close. Close. Close. What we say, 506B is another section of the code, and it's – that comes under a heading Determination of Secured Status. And what 506B says is to the extent that there is, call it collateral coverage for those fees, they will be treated, to the extent reasonable, as a secured claim. Okay? That's what 506B does. 506B says – doesn't say one way or the other what happens if there's not collateral coverage, i.e., an unsecured claim, which is what we have here. And so our logic is to the extent you're determining the unsecured claim, you go back to 502B, and there we're not in an exception. That's the logic of the SNTL case. It has been cited a number of times since by several other courts, all with great approval, because it follows the logic of the Supreme Court in the Traveler's case. It also follows the logic in the Ninth Circuit case. I think it's called 238 or has an odd – 268 has an odd name, where the fees – where there was an unsecured portion of those fees and it was remanded for determination of those fees. It didn't finally award the fees, but if you follow the logic of that case, you come to the same place. I do want to mention – I do have to say one other thing, one or two other things. Mr. Richard said repeatedly that we don't rely on Article 10. Completely not so, and the BAP understood that fully. He also said that we didn't, in the Bankruptcy Court, rely on the Common Law Doctrine or the Wallace case. If you look at our brief in the Bankruptcy Court, you'll see the Wallace case and the Cantor case and this doctrine very, very prominently discussed in those briefs. We did. We did. And one other point that struck me of something I should mention, because there was one statement in Mr. Richard's brief that I thought I had to actually respond to, which was that at page 41 of his brief, he has a statement that any claim by center for the fees and costs up to the $180 million should necessarily be allowed. And I think the tenor of his remark there is that because there was a release, this Article 3 release, somehow if you gave credence to his argument that that release does not have the Article 10 carve out, that that would solve the fee issue. And what I wanted to point out here is that we also seek fees under the Underwriting Management Agreement, under the Claims Administration and Servicing Agreement. There are several sources for the fees here. I'm just making a technical point here. Anyway, my red light's on, so thank you for your briefing. Thank you, counsel. I think we have exhausted the appellant's time. Unless my colleagues want to hear more. SNPL v. Centers. Thank you.
judges: Hall, Kleinfeld, Silverman